[Opinion delivered March 17, 1886.]

---

[No. 2049.]

## R. F. CLANTON *v.* THE STATE.

1. MURDER — MANSLAUGHTER — ADEQUATE CAUSE — CHARGE OF THE COURT.—
The relationship of step-father and step-daughter subsists so long as the marriage relation subsists between the step-father and the mother of the step-daughter. One of the adequate causes to reduce a homicide to manslaughter is "insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide." In such case it is not essential that the female insulted, she being a relation, shall be under the protection of the slayer at the time either of the insult or the killing. It is only when the female insulted is not a relation of the slayer, that it is required that she shall be under his protection, in order that the insulting words or conduct will amount to adequate cause. In this case the relationship of step-father and step-daughter existed between the slayer and the female insulted, and, therefore, the trial court erred in charging the jury that, before they could find the insulting words to be adequate cause to reduce the homicide to manslaughter, they must find that she was under the protection of the accused.

2. SAME — PRACTICE IN THIS COURT.— It is not within the discretion of this court to consider the effect upon the jury of an erroneous charge of the court, if the same was promptly excepted to at the time it was given. In such case the conviction must be set aside, however immaterial the error may have been.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The indictment in this case charged the appellant with the murder of Charles Cook, in Williamson county, Texas, on the 2d day of October, 1885. His trial resulted in his conviction of murder in the second degree, his punishment being assessed at twenty years in the penitentiary.

Doctor Maney was the first witness introduced by the State. He testified that he was called to see Charles Cook, the deceased, after he was wounded on the 2d day of October, 1885. He was wounded in two places. The first ball entered the left side between the seventh and eighth ribs and ranged downwards. The second entered on the same side about two inches below the first and about two inches from the back bone. The second ball cut the bladder and passed diagonally through, towards the front of the body, but did not pass out. The two balls took the same general course, and both, as shown by probing, penetrated the cavity. The witness cut the first ball out. Witness thought, judging from the course of the wound, that the deceased must have been on his knees when he was struck by the first ball. Cook died from internal hemorrhage on the day after he was shot. The wounds were fatal, although possibly, under more favorable circumstances, one person out of one thousand wounded in like manner might recover. The witness's long experience in surgery enabled him to speak with some certainty as to the position of the body when struck by the ball, though he could not tell with mathematical certainty the course of the ball through the body. Death, in this instance, was certainly produced by the ball which entered the body near the back bone and cut the bladder and probably the intestines.

Oran Shiver testified, for the State, that he lived on Brushy creek in Williamson county, about ten miles from Georgetown. Witness had known the defendant about three years, and the deceased about the same length of time prior to his death. Deceased lived on Mrs. Clanton's place in Williamson county, and was killed on Friday, about the 1st of October, 1885. The crop of cotton then being harvested on Mrs. Clanton's place belonged to Mrs. Clanton and

the deceased, and was made by Mrs. Clanton, deceased and the witness. The witness left the place in August, but returned about a week before the homicide. Mrs. Clanton, her children, deceased and witness were picking cotton in the field on the day of the killing. Witness first saw the defendant in the field that day when he was within about four hundred yards of where the parties named were picking cotton. Defendant was not then living on Mrs. Clanton's place, and the witness had not seen him on the place since the previous July. Defendant came up behind witness and said: "Good morning, Cal." He then remarked: "Here are all of my children." He then said to his wife: "Jane, I have bought some things,— clothing and food,— for my children. I want you to go to the house to receive them." He then turned to deceased and said: "Cook, I want you, too, to go to the house and see the things received." He then said: "Cook, I have heard that you have said that I shall not visit my children." Thereupon the defendant began shooting, and deceased started to rise up. Witness looked around and saw the defendant with his pistol out. His first shot passed above deceased. His second took effect in Cook's side, when the latter was nearly straight. The third shot struck Cook in the back. Cook ran, and defendant pursued him until he fell. The defendant then returned and pointed his pistol at Mrs. Clanton, and made an effort to shoot. When shot, Cook was in his shirt sleeves, with a cotton sack around his waist. When the shooting began, Cook ran. He stumbled and fell, and said to defendant: "You have fixed me; you needn't shoot any more." Defendant drew his pistol from under his vest when he began shooting.

Cook died on the day after he was shot by the defendant. Cook, Mrs. Clanton, her children and the witness were in the field gathering the crop that Cook had raised, when the defendant came to the field and shot Cook. The deceased did not speak a word until after the defendant shot him. The witness saw the defendant draw his pistol from under his vest, point it at Cook, and fire. At that time Cook was on his knees picking cotton. When the first shot was fired Cook started to get up, and was fired upon the second time by the defendant. Cook then ran, maintaining a stooping posture, and defendant fired again. Cook then told defendant that he need not fire again, as he had fixed him. Cook was in his shirt sleeves, unarmed, and had nothing in his hands. He made no effort to strike or harm the defendant.

Lee Clanton was the next witness for the State. He testified that he was present in his mother's field and saw Charles Cook shot by

the defendant, the witness's father. The defendant came to the field
and spoke to all of the parties present. He told Mrs. Clanton to go
to the house and receive some goods and clothing that he had bought
for his children. He then turned to Cook and told him to go to the
house and see the goods received. He then fired upon Cook three
times, and turned and covered Mrs. Clanton with his pistol. Wit-
ness saw him draw his pistol from his vest and fire it. Cook was
picking cotton when the first shot was fired. About one month
before the killing, while defendant and witness were *en route* to
Round Rock from Georgetown, the defendant told the witness that
he would yet kill both Cook and Mrs. Clanton if he went to hell for
it five minutes afterwards. For the three months next preceding
the killing, witness had been with the defendant in Bell county,
peddling. The defendant was not living with his wife, Mrs. Clan-
ton, at the time of the killing, and had not been for three years.
During the three years of his separation from his wife, the defend-
ant lived in Bell, Lampasas and Coryell counties. Mrs. Clanton lived,
during that time, on her place near Round Rock in Williamson
county. Witness and defendant came together from the up-country
on the day of the killing. They passed through Georgetown to
Mrs. Clanton's place. When they reached the house, the defendant
sent the witness to the field, where the several parties were at work,
and soon followed. He shot Cook when he reached the field, after
the talk stated.

James W. Gilreath testified, for the State, that he was a son of
Mrs. Clanton, and a step-son of the defendant. He would attain
his fifteenth birthday in February, 1886. Witness was in the field
picking cotton at the time of the homicide, in company with his
mother, Mrs. Clanton, three others of her children, the deceased
and Oran Shiver. The defendant came to the field between 3 and
4 o'clock in the evening. He spoke to all of the parties named, and
told Mrs. Clanton that he had bought some clothing and provisions
for the children, which she must go to the house to receive. He
then spoke to Cook, and, Cook making no reply, he fired upon Cook.
When the first shot was fired Cook was stooping over, picking cot-
ton. Cook then raised up and said: "You must be going to fight."
Defendant replied: "I will show you, G—d d—n you," and fired
the second shot. Cook ran, and the defendant followed and fired
the third shot. About 10, or, perhaps, as late as 12 o'clock on the
next day, Cook died from the wounds then inflicted by the de-
fendant.

Cross-examined, the witness said that the defendant had fired

his second shot when he said to Cook: "I will show you, G—d d—n you." Cook did not pick up a rock when he raised up just after the first shot was fired. Cook did not use an oath as he fell. After the deceased fell to the ground the defendant turned and ·pointed his pistol at Mrs. Clanton. Cook had been living on Mrs. Clanton's place about two years when he was killed. After the shooting the parties in the field went to the house and found a sack of flour which had been left by the defendant. Cook did not, at the time of the killing, say to the defendant: "G—d d—n you, I sent you word not to come on this place." Witness had never heard Cook threaten the life of the defendant. The witness borrowed a gun for the purpose of killing squirrels, and did so at the request of his mother, and Cook sometimes took the gun in his wagon, in driving about, for the purpose of shooting squirrels. Mrs. Clanton and defendant had been separated about two and a half or three years. The place on which the killing occurred had been Mrs. Clanton's home for thirty years, but belonged to the witness and his sister. Mrs. Clanton owned· the place before she married the defendant, and lived on it during the period of her separation from the defendant. The defendant's son, Lee, first came to the field on the day of the killing. Defendant arrived about ten minutes later and spoke to the several parties present. He said to the deceased: "How do you do, Mr. Cook?" Cook did not reply, nor did he see the defendant draw his pistol. From the effects of the wounds inflicted by the two last shots, Cook died on the next day. When shot, Cook was picking cotton, having his cotton sack hanging around his neck. He was in his shirt sleeves and was unarmed. He had not said a word to the defendant when the latter fired the first shot. Defendant, several times since his separation from Mrs. Clanton, called at the house to see his children, on each of which visits he brought some clothing and food for his three children then living with Mrs. Clanton. He had never contributed otherwise to the support of Mrs. Clanton or her family.

A. H. Ray testified, for the State, that he lived on the Lampasas river, twenty-one miles from Belton. Witness was the justice of the peace for precinct No. 8 of Bell county, Texas. He had known the defendant since September, 1885. During that month, the defendant, then a peddler, drove up to the witness's house, and told witness that he had some accounts he wanted collected. Witness told him that he did not do a collecting business in his official capacity. Defendant talked a great deal to the witness in the course of that visit, but, as witness did not then care to hear, he paid but little at-

tention to what the defendant had to say. He could remember, however, the substance of much the defendant said. He said something about having sent some clothing to Round Rock, something about having left his wife, and something about a man living with his wife. He then asked the witness something about what circumstances would, in law, justify a man in killing another, and, the witness thought, he said something about his purpose to kill the man who was living on his wife's place. He made this last statement in connection with statements he made concerning his family troubles. He mentioned his wife and step-daughter in the same connection. The witness supposed that the defendant gave him a full account of his family troubles, but, as witness did not care to hear it, he paid but little attention to what the defendant had to say. Defendant spoke of his wife as an illiterate woman, who did not appreciate him. The witness told the defendant of various circumstances under which a man would be justified in killing another man, and defendant said that he intended to kill the man who lived on his wife's place near Round Rock. He said that, in view of that purpose, he wanted to know what circumstances would, in law, justify him. The State closed.

Miss Alta Gilreath testified, for the defendant, that she was the step-daughter of the defendant, and was eighteen years old. She was engaged to be married to Charles Cook at the time of his death, and it was arranged that the marriage should take place during the week following that on which Cook was killed. Cook, about six months before his death, seduced the witness under promise of marriage, and the witness was now pregnant as the result of the cohabitation with Cook which followed the seduction. Witness had heard that Cook had a wife and two children, and while, perhaps, she never heard Cook say that he was divorced from his wife, she understood that his wife had procured a divorce from him.

On her cross-examination the witness gave substantially the same account of the occurrences in the field at the time of the shooting that James W. Gilreath gave. She stated, in addition, that, so far as she knew, the defendant was ignorant of the fact that she was pregnant or had been unduly intimate with Cook, at the time of the killing. So far as she knew, the knowledge of that fact was confined to the witness and Cook. It was not then, and had not been, common neighborhood talk that she and Cook practiced illicit intercourse, and the witness had not withdrawn from society on that account. The defendant had four children by the witness's mother. He had never for five years contributed to the support of

his wife and family. He had never clothed and fed the witness; he had never sent her to school, and he never, during witness's childhood, treated her as he should. He had never objected to the witness associating with Cook. Defendant was at Mrs. Clanton's house but once after the illicit intercourse between Cook and witness began. He did not then, nor did he ever, speak of it to the witness. The witness had been engaged to Cook about ten months at the time he was killed, which fact was generally known in the neighborhood. She had never heard of Cook bragging, in Round Rock or elsewhere, of having seduced her. The marriage of Cook and witness was first set for the second week in September, 1885, but was postponed by Cook on the ground that he had not yet got his divorce. Witness knew nothing of the divorce except what Cook told her, and he told her that he would get the divorce in time for the marriage to take place on the Thursday of the week which succeeded his death. Defendant had not been at the house, nor had he seen the witness, since July, 1885, until the day of the killing. He knew nothing of witness's condition at the time of the killing, so far as the witness knew, nor had he ever learned it, so far as the witness was aware, until the present moment. Witness's mother did not know of witness's pregnancy at the time of Cook's death. Witness did not believe that anybody knew of it at the time of the killing but Cook and herself. Witness was now about seven months advanced in pregnancy.

H. G. Niblo was the next witness for the defense. He testified that he lived about two miles distant from Mrs. Clanton's place. Witness had known the deceased about five years at the time of his death. Deceased lived on the witness's place about four years ago, and then had a wife and two children. Two years ago deceased lived on Hanna's place. He had no wife nor children with him then. Mrs. Cook lived in Burnet when the witness last heard of her. If deceased and his wife had ever been divorced, the witness had never heard of it. The witness last saw Mrs. Cook in camp near his house, with a man from Liberty Hill whom he did not know. The man's little boy came to witness's house after water, and said that the man and Mrs. Cook were married. The witness last saw Miss Alta Gilreath, before this trial, in August, 1885, but could observe, or, rather, he noticed nothing wrong in her physical development then. The witness had heard rumors to the effect that an unlawful intimacy existed between the deceased and Miss Gilreath. He heard of those rumors from the defendant. At the time of the killing defendant had been away from the neighborhood about five years, and had

not lived with Mrs. Clanton for a long time. Mrs. Clanton had lived on her place about three years after her separation from the defendant. The witness had never heard any one but the defendant say that the deceased was intimate with Mrs. Clanton or with Miss Alta Gilreath. Defendant first told witness of it in July, 1885. Witness did not know of Miss Alta's pregnancy until recently. He knew nothing of it at the time of the homicide. The witness did not know the defendant's handwriting, but received letters signed with the defendant's name, which letters being handed to him, he identified them. The defense thereupon admitted the authenticity of the letters exhibited, and waived further proof of their having been written by him.

Charles Brown testified, for the defendant, that he knew Cook, but not intimately. Witness and Cook traveled together to Round Rock, about six weeks before the killing. Cook, in speaking of the defendant, called him "old glass eye." Cook said that the defendant had been talking about him, and that if defendant ever came about him, bothering him, he would "bust his d—d old hull." Cook said that defendant had been slandering his, defendant's, wife and step-daughter, charging them with living in adultery with him, Cook, and that it was a d—d lie. He said further that defendant had written such slanders to parties living in the neighborhood. The witness had never told the defendant of those statements. He had not seen the defendant since, until upon this trial. Cook said that he had nothing against the defendant except that he circulated through the neighborhood the false rumor that he, Cook, had been criminally intimate with his, defendant's, wife, and that he wrote letters throughout the neighborhood slandering his wife.

Lee Clanton was next recalled on behalf of the defense. He testified that when the defendant left home he took but two horses and a wagon with him. Witness could not say with exactness how long ago the defendant left home. He came back home in March, July and October of 1885, and brought something for the family on each occasion. Defendant pursued the calling of a peddler through Bell and Burnet counties, and four years ago he farmed on Doctor Wooten's place. The defendant sold a piece of land at Copperas Cove while the witness was with him. Mrs. Clanton owned a half interest in that land. The witness heard the defendant say that he would kill Cook and Mrs. Clanton if he went to hell in three minutes afterwards. He spoke of Cook and Alta marrying, and expressed himself as opposed to the marriage. He told witness, during the summer of 1885, that Charles Cook had married Alta

Gilreath. Witness stayed with the defendant all of the time recently before the homicide.

A. H. Ray, recalled on behalf of the defense, testified that the condition of the defendant's mind in September, 1885, appeared to be unsettled —" roving." In the opinion of the witness the defendant was cranky or confused. By " cranky " witness meant that he thought the defendant "rather off,— not exactly right in his mind." When the defendant left, the witness remarked to his wife: " That man is half crazy." The defendant's business ideas seemed perfectly good. He finished his business talk and then brought up the conversation in which he spoke of his family troubles, the degrees of murder, and justifying circumstances in homicide. His mind appeared perfectly clear in discussing the collection of debts, and he seemed intent on finding out just how the law would justify him in killing the man then living on his wife's place.

Martin Magee testified, for the defense, that he had known the defendant since his boyhood. Witness knew that there was insanity in the defendant's family. He knew that the defendant had two brothers who were insane. The defendant's mind, so far as the witness knew, was all right. He last saw the defendant about two years before this trial. He had changed greatly in appearance, and in his eyes, since then. Witness had not talked with the defendant, but could readily detect a great change in the expression of his eyes. Up to two years ago the defendant's mind was all right. Witness had not seen him since until upon this trial, and based his opinion now upon appearances only.

Doctor William Fleming testified, for the defense, that he had been a practicing physician for twenty-five years, but knew little about insanity, as his practice in that direction had been limited. Moral insanity was very difficult to define. Mania is one form of insanity. Witness had treated some few cases of insanity in his practice. In his opinion if one member of a family is insane, another member of the same family is much more likely to be affected with insanity than would be the case with one whose family was totally clear of the taint of insanity. The witness would be unable to decide upon the insanity of a person by a mere examination. He would have to be thrown in close and constant contact with a person for some time, to be able to determine upon his insanity. " A monomaniac is a person insane with violent feelings upon one particular subject." The monomaniac dwells insanely upon one particular subject, and is sane upon all others. In such cases, the witness thought, the will is under the control of the particular idea.

*Quære:* "Not in all cases?"

*Answer:* "It may, in some instances, assume such intensity as to prevent the operation of the will. A germ of insanity may exist in a person, and may or may not develop. Some symptoms of insanity are violent and some are mild. There is no general rule governing symptoms. Insanity may exist, or it may be feigned to an extent that it would be impossible to detect its character without being with the person for a long time."

Doctor Walton testified, for the defense, that he had been a practicing physician for seven years, but had only a general knowledge of mental diseases. There is such a thing as hereditary insanity. Hereditary insanity implies a family taint of insanity. If one member of a family develops insanity, it is more likely that insanity will be developed in some other member of that family than that it will appear in some family not tainted with it. Monomania implies insanity upon one particular subject. Upon one subject the mind of the monomaniac is perverted; upon all others it is sound. A sudden suggestion, turning the mind of the monomaniac upon the subject upon which he is insane, would, in all probability, lead him to dwell and talk upon it.

Doctor Jones testified, for the defense, that he had been six years a practicing physician. He had been treating the defendant since his confinement in jail,—now about four months. During that time defendant had complained a great deal of headache. He was not, at best, in the opinion of the witness, a very bright man. Witness had not treated him for insanity. Headache is a symptom of insanity, and quiet will frequently relieve insanity. Witness did not treat the defendant for insanity, and could not say that he was insane. Witness had discovered nothing in the defendant during his attendance upon him which leads him to think the defendant insane.

It was the opinion of Doctor Graves, who defined monomania as insanity upon a particular subject, while the person may be sane upon all others, that a monomaniac was not responsible for his acts. Insanity is more likely to develop in one whose family is tainted with insanity than it is in one whose family is not. Insanity is sometimes hereditary, but even then it does not always develop in all of the members of the tainted family.

Tom Robinson testified, for the defense, that he went to school to the defendant about ten years ago. Defendant was then a good teacher, and seemed to be as intelligent as the average man. Witness had seen the defendant but once or twice during the last two

years. He seemed to witness on each of those occasions a very different man, mentally, than he had been. During the last spring, the witness met the defendant in the road. He got out of his wagon and came to witness's wagon, and proceeded to shake hands with witness and the members of his family. He talked to and of them like a sane man. He then began to talk about his family troubles, and witness told him that he was hurried and drove on. The witness never thought of defendant's being insane. Witness lived in the same neighborhood with Mrs. Clanton. He never heard of Alta Gilreath's pregnancy until after Cook was killed. The defense closed.

J. Sutton was the first witness called by the State in rebuttal. He testified that he lived in sight of the place owned and occupied by Mrs. Clanton, and had lived that near Mrs. Clanton for seven years. The witness never at any time heard any rumors affecting the character of Mrs. Clanton or her daughter, except such as were repeated to him by the defendant, on the 25th day of March, 1885. On that day defendant came to witness's house and said that he had come to see his children. He wanted to stay and live with the witness. Cook came over one morning while the witness was standing at his wood pile, and said to defendant in the hearing of the witness: "I have come over to kill you; you have been trying to break up my business." Witness followed Cook into the house. Cook stopped at the fire-place. Defendant went into the kitchen, Cook followed him, and witness followed Cook. Cook had a stone in his hand, and the defendant a knife. Cook said: "You have a knife." The witness did not see Cook pick up the stone, and thought that he drew it from his pocket. Witness interfered and stopped any further difficulty between Cook and defendant, and both of them took dinner with the witness on that day. After dinner Cook sent word to the defendant that he wanted to talk to him in the presence of the witness and his wife. Defendant agreed, and, in the conference that ensued, they agreed not to use each other's name in the future. The witness never heard Cook mention the defendant's name afterwards, except to say that he would be friendly with defendant as long as defendant let him alone. The defendant first drew his knife in the kitchen. Cook charged that the defendant had been trying to hire his hands and break up his business arrangements. The defendant said that he wished Cook and Cal. would leave Mrs. Clanton's place. Just after the shooting on the 2d day of October, Miss Alta Gilreath came for the witness to help carry Cook to the house. Her physical development at that time indicated no

signs of pregnancy. Her pregnancy is now apparent. Witness was unable to say whether or not the defendant knew of the seduction of Miss Alta at the time he killed Cook. The defendant and his wife had been separated about three years at the time of the killing. The witness knew of the defendant sending aid to his family during that time. About a year before the killing the defendant sent the witness $20 for his family. The defendant visited Mrs. Clanton's place some time in March. The witness knew nothing of Alta Gilreath's criminal intimacy with deceased until some time after the killing. The letter now shown the witness he identifies as one he received from the defendant some time in July, 1885. It is written in the defendant's hand-writing. If Clanton was in the neighborhood after July 20, 1885, until he killed Cook, witness did not know it.

The State at this point, in rebuttal, introduced in evidence the letters identified by the witnesses Niblo and Sutton, and admitted by the defendant to be genuine. The first of these letters reads as follows:

"COPPERAS COVE, May 10, 1885.

"MR. H. G. NIBLO:

"*Dear Sir* — On March 23d I arrived on Brushy creek on a visit to my children. Mrs. Clanton seemed very friendly. I told her that I came to see about my children, and that I did not want to molest her, or have anything to do with her outside of the children. I brought some hogs down with me which I wanted to turn loose in that range. I asked her if she would see to them for the children. She said that she would, and wanted me to put them in a pen, but I told her that I would only turn them loose. I then asked her if she was willing for Lee to stay there until I could get a place for him to board at; that I wanted to send him and Charley to school. She expressed herself perfectly willing. I then inquired for Altai, and she told me that Altai had gone down into the lower field to take Cook and give (him) some water. I asked her what that meant,— if Cook and Altai were married? She said: 'Not exactly.' Then asked her what Cook was doing there, and she said she had him hired. I left and went to Ike Sutton's to stay all night. I then learnt that she had rented the place to Cook and that old Cal. was there also.

"On the next day I went to Round Rock and made arrangements with H. B. Sheppard to board my two oldest children, and on the next day, which was Sunday, I went over and spent with my children. Everything passed off quiet, and the old lady begged me to let Lee and Charley stay there, and get Mrs. Ike Sutton to teach them. I made the arrangement with Mrs. Sutton; but in the mean-

time I heard some very scandalous talk about Mrs. Clanton and Altai, and Cook and old Cal. I talked to Altai about it, and about taking water out to the (field) to Cook. I also talked (to) the old lady and told her that if she did not stop such things that I would not let the children stay there, and would draw of bond as guardian. She got very mad and said that Cook was a much better man any way, than those that talked about him, and spoke in the highest terms of Cook. I saw her again on Monday morning. She was very mad, and threatened to make me take all four of the children, if I said anything more to her. I went to Round Rock and saw old Cal. and Cook and Jim and Bill Anderson. Old Cal. told me that there was a sight of cramming going on up at the widow's, and that he had quit, and that Cook wanted to sell out to me, and that the old lady was very mad with me, and a great deal more which I have not space to write. In the evening old Cal. struck me in the face in Round Rock. I drew my knife, and I would have killed him, but I could not see. I came very near striking another man for him; for at this time, and for two months previous, I had been very near blind with neuralgia of the eyes. That evening I saw the old lady and she said she intended to have me killed if (I) did not take the children and leave.

"I went to Ike Sutton's that night, where I was staying, and after dark Cook and Jim Gilreath and Bill Anderson came over and tried to raise a row, but left, apparently satisfied, though Cook remarked as he left that, if I fooled with him, he would kill me. I did not want to get into any trouble with them, if I could help it, for I knew that if I got into law that I would be forced to tell a great deal on the old woman and George Gilreath that I did not want to tell, on account of her being the mother of my children and George Gilreath being their half-brother. I thought I would take my children and leave, but I was taken down sick (in) my back, and was not able to travel, or scarcely get up and down. In the meantime Cook came back to Sutton's and talked very insulting, and the old woman wrote several very insulting notes, and in one threatened to send the children and what things I had left there for them to the line between her house and Sutton's, and said they should not stay at her house. On Wednesday morning, the 25th of March, the old woman wrote me a very insulting note, demanding that I should come and get the children and their things. Cook came over, and was also very insulting, but left and said he intended to leave and bid Sutton's family good-bye. In about one hour he came back armed, and the first thing he said (was) that he had come back to kill me, and that one or the other of us had to

die. He at first drew a large stick on me and then a rock, and he was one of the worst excited men I ever saw, and he remained for at least three hours trying in every way to kill me, and was only prevented by the interference of Ike Sutton and his wife. He came into the house several times, and remained in and around the house for at least three hours. In the meantime, I had that morning left my knife in Ike Sutton's old kitchen or the house in which Bill Sutton formerly lived, and was utterly unarmed, sick and unable to do anything. I told him that if he would give me a chance to arm myself, or that if he would wait until I got up, so that I could defend myself, that I would fight him in any way on earth that he wanted to fight; but he would give me no chance whatever, but finally left.

" That evening the old woman wrote me a note stating that I had to take all of my children away from there the next morning, sick or well, and from Ike Sutton's actions I thought and still think that he was as deep into it as Cook and the old woman, and I am satisfied that if (it) had not been for Mrs. Sutton and Mrs. Hamilton, he would have let Cook murder me in cold blood, and if it had been necessary would have helped done the deed. On Thursday morning, sick as I was, I went to get my children, when the old woman signed a written relinquishment to the children, and Ike Sutton and Joe Hamilton witnessed it. She then wanted me to leave the two youngest with her until I could wind up my business, but said that the two oldest should not stay on the place. Cook's reasons for wanting to murder me was for my talking to Altai and the old woman about him, and telling them that he had no right to marry simply because his, Cook's, wife was married and had given him permission to marry. I told them that he must get a divorce, and reasoned with the girl about throwing herself away, and with the mother about disgracing herself and daughter. The girl said that she had no use for Cook, and so did Jim, but the old woman thought Cook a great man, and did give up her little children for the sake of keeping Cook and old Cal., and I have no doubt would have given up Jim and Altai. Cook told over many things that took place six and eight years ago, that the old woman had told him, and if it had been in the dark, or if he had worn the old woman's dress, I would have thought it was her instead of Cook that was trying to murder me. I cannot tell you the tenth part of what he said and what took place. It was the most cowardly and brutish attack on a sick man, and carried on with the most cowardly and brutish manner that I ever heard of in all my life.

"I don't know that I have a friend in that whole country, but I

take you to be a brave man, and one who would give even a dog a chance for his life. I had sold my place before I came down. I expected to have received ($300) three hundred dollars by the 20th of April. I have forty head of cattle that I have been trying my best to sell. I also have five good horses that I have been trying to sell, but so far I have not been able to raise a dollar. May have from three to six hundred dollars any day, and just as soon as I can possibly get money I will be down and have the whole outfit put under bond to await the action of the grand jury. If you are a friend to me, or if you feel any interest in the matter, I want you to pump old Cal. and find what you can. I want to bring suit against the old lady for divorce, as well as prosecute her and Cook and old Cal. for an attempt to murder me. For Cook had a great deal to say about old Cal. and about my former objections to his staying there. He also stated it was understood with him and George Gilreath that he was to kill me if (I) ever again attempted to go inside of the old lady's yard, let alone her house; and my little boy Charley states that Cook was to kill me, you, Tom Roberson and Cobb Brown, if either one of us ever came into the yard, or passed down the lane. The old woman nor Cook said nothing about you, but both seemed very bitter against Tom Robertson and Jim Champion and Cobb Brown.        Respectfully,

"R. T. CLANTON."

The second letter reads as follows:

"FLORENCE, TEXAS, July 21, 1885.

"ISAAC SUTTON:

"*Dear Sir* — I was summoned before the grand jury to give testimony in regard to Cook's attempt to kill me at your house last spring. Of course you know that I was sworn to secrecy, but I will state this much: I was asked a great many questions in regard to Mrs. Clanton, and the private life me and her lived when pretending to live together as man and wife, and respecting her virtue; also about her giving up her children, and many other questions of a scandalous nature. I was also advised to put her and Cook under a peace bond, and I went to see Squire Wood at Round Rock in regard to it. He told me that, in order to do so, that there would have to be an examining trial, and that all the witnesses would have to appear in open court, and give their testimony, and from the question that had been asked me, and which I knew would be put to Mrs. Sutton and Mrs. Hamilton, and for the sake of Mrs. Clanton's and Altai's character, I refrained from putting Cook under bond, and risked my life in visiting my children and taking Lee and

Charley to see their mother and little brothers. I did everything on earth that I could do to keep peace and decency, but on yesterday morning, July 20, 1885, this man Cook tried by every means to get up a second fuss by cursing and even threatening my life. On yesterday, on reaching Georgetown, I was immediately called before the grand jury for the second time and compelled to answer to everything that had taken place on my visit to my children, and ordered to put Cook under bond.

"Now, Mr. Sutton, you and Mrs. Sutton know that I am on my next trip, which will be in about two weeks that I will be forced to put this fool under bond, and that Mrs. Sutton and Mrs. Hamilton will be dragged into court, and that Mrs. Clanton's private character as well as her daughter's will be investigated, and you know from what I have told you that it is not good. I am satisfied that they are virtuous women, but everything is against Mrs. C., and there is scandalous talk about her and her daughter; and the way Cook is acting, he is disgracing and ruining them. I am willing to risk the consequences, if they are, but I love Mrs. Clanton and Altai, and hate to see them ruined, but as certain as I live, I will put old Cook under bond when I return. I think that the best thing Mrs. Clanton can do is to buy Cook out and get rid of them, for he will ruin and disgrace her and Altai if he stays there, and also involve you in trouble.

"I know what your testimony was before the grand jury as well as you do, and if this thing is not stopped, and old Cook don't let me alone, it will result in one of the dirtiest, low-downed, scandalous law suits that ever took place in Williamson county. While I love Mrs. Clanton, yet I will not be imposed upon any longer, and will have the law strictly enforced, and if you can stop the fool, please do so.                        Respectfully,

                              "R. T. Clanton."

Oran Shiver, recalled by the State in rebuttal, testified that he saw the defendant in Round Rock in July, but did not on that occasion tell him there was something wrong. On the contrary, he told the defendant that there was nothing wrong. In other words, defendant asked witness if there was not something wrong at Mrs. Clanton's, and witness replied that there was not. Witness did not on that day tell defendant that a great deal of "banging" was going on up at the "widow's." The witness did not then know that anything wrong had transpired. He did not know that Alta was pregnant. She did not show pregnancy at that time.

David Love testified for the State, in rebuttal, that he talked to the defendant on the morning of the day of the killing. Witness had known the defendant for ten years, and if he was irrational on that occasion he did not show it.

The motion for new trial raised the question discussed in the opinion.

*Fisher & Townes* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. I. In applying the law of manslaughter to the facts of the case, the learned judge in his charge uses the following language: "If the jury find from the testimony that, at the time and place as alleged in the indictment, the defendant unlawfully and voluntarily shot and killed the said Charles Cook, and that, at the time of such shooting the defendant was under the immediate influence of sudden passion, arising from insulting words or conduct by Cook towards the step-daughter of defendant, and under his protection at the time," etc. This particular instruction was excepted to by the defendant at the time it was given to the jury, and a proper bill of exception was reserved.

It will be noticed that the instruction requires that the step-daughter of the defendant should, at the time of the killing, have been under the defendant's protection in order that the insult to her should have the effect to reduce the homicide to manslaughter. In this view of the law we cannot agree with the learned judge. One of the adequate causes named in the statute which will reduce a homicide to manslaughter is "insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide." (Penal Code, art. 597, subdiv. 4.)

It is not required that the female insulted, if a relative of the slayer, should be under his protection, either permanent or temporary, at the time either of the insult or killing. It is sufficient if she be a *relative.* It is only in case that the insulted female is not a relative of the slayer that the law requires that she should be under his protection. (Penal Code, art. 601.) *Any* female under his protection at the time of the killing is included within the meaning of *relation.* In this instance, the female whom it is claimed the deceased insulted was the step-daughter of the defendant. She was, therefore, a *female relation* of the defendant, and, being such, it made no difference

whether or not she was under his protection at the time of the killing. That she must be regarded as a female relation of the defendant, we think there can be no question. (Penal Code, art. 330; *Compton* v. *The State*, 13 Texas Ct. App., 271; *McGrew* v. *The State*, id., 340; *Nance* v. *The State*, 17 Texas Ct. App., 385.) The marriage relation still subsisted between the defendant and her mother, and, as long as such marriage relation continued, the relationship of step-father and step-daughter existed. If such marriage relation had been dissolved by death or divorce, then the view entertained by the learned trial judge would, we think, have been correct.

II. As the charge referred to above is erroneous, and as it was excepted to promptly and properly, we have no discretion with reference to it. We are not at liberty to consider its probable effect upon the minds of the jury, or whether it was demanded by the evidence. However immaterial may be the error, we must set aside the conviction because of it. Such is the language of our statute and the rule declared by the decisions. (Code Crim. Proc., art. 685; *White* v. *The State*, 17 Texas Ct. App., 188; *Buntain* v. *The State*, 15 Texas Ct. App., 485; *Niland* v. *The State*, 19 Texas Ct. App., 166.)

We have duly considered the other assignments of error presented by counsel for defendant, and are of the opinion that none of them are well taken, and, but for the error in the charge above discussed, we would affirm the conviction; but because of that error we must set it aside. The judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*